UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

-------------------------------------------------------------------- x

ROE, JOHN, et al.,

                                 Plaintiffs,

                              v.

AMAZON.COM, INC., et al.,

                                 Defendants.

:
:
:  Case No. 3:15-cv-00111
:
:
:  Judge Hon. Thomas M. Rose
:
:  Magistrate Judge Michael R.
:  Merz
:
:
:
:
:
:
:
:

-------------------------------------------------------------------- x

**<u>MEMORANDUM OF DEFENDANT APPLE INC. IN SUPPORT OF SUMMARY
JUDGMENT</u>**

**Table of Contents**

Preliminary Statement ................................................................................... 1

Facts ............................................................................................................... 2

I.   The Distribution of Ebooks Generally. ................................................... 2

II.  The Distribution of *Gronking* by Apple. .............................................. 4

Argument ....................................................................................................... 7

I.   The Standard for Summary Judgment. ................................................... 7

II.  The First Amendment Protects Distributors Of Literary Works From Tort Claims
     Based On Their Mere Distribution Of Such Works ............................... 8

III. The Incidental Display Of A Book Cover In Connection With The Sale Of A
     Book Is Neither A Right Of Publicity Violation Nor An Invasion Of Privacy. ... 12

Conclusion ................................................................................................... 17

Defendant Apple Inc. ("Apple") submits this Memorandum of Law in support of its motion for summary judgment dismissing the Complaint against it with prejudice.

## Preliminary Statement

Apple is only a distributor, not a publisher, of electronic books ("ebooks").  Through its widely recognized iBooks Store (the "iBooks Store"), Apple enables consumers to download a vast array of ebooks, but it does not create or edit those works in any way.  For that reason, it is the online version of a traditional "brick-and-mortar" bookstore, library, or newsstand.

Among the millions of ebooks Apple makes available through its iBooks Store is *A Gronking To Remember* ("*Gronking*").  *Gronking* is a work of pure fiction, written and published during the 2014-15 New England Patriots NFL championship season by defendant Greg McKenna under the pseudonym "Lacey Noonan."  It features the make-believe exploits of Patriots' tight end Rob Gronkowski, in a variety of situations involving what the publishing industry refers to as erotica.

The Roes' Complaint alleges that when Mr. McKenna first "wrote and . . . published" that book, Complaint for Money Damages an Accounting and Equitable Relief ("Compl.") ¶ 3 [Doc. No. 7, PageID 47], the original cover was illustrated with a photograph of the Roes that Mr. McKenna used without permission.  The Roes, however, correctly allege that Mr. McKenna, not Apple, created that cover, *id.*, and the record in this case bears that out.  Apple had no involvement with *Gronking* other than to "offer[] the book" to the public.  *Id*.

That undisputed fact means that summary judgment should be granted dismissing the claims against Apple with prejudice.  Under bedrock principles of constitutional law, bookstores, libraries, newsstands, and their modern day Internet equivalents cannot be held liable for the simple act of distributing books, newspapers, or magazines written and published by others.

This rule, the rationale for which was explained by the United States Supreme Court over fifty years ago, has been widely and consistently applied to all types of parties along the various distribution chains for printed – and now electronic – material:  public libraries; newsstands; brick-and-mortar bookstores that operate in the real world and those that make ebooks available online.  Because the Roes have acknowledged Apple's only role with respect to *Gronking* was as a distributor of that ebook and the undisputed facts show no other involvement truthfully could be alleged, the Complaint against Apple should be dismissed with prejudice.

**Facts**

**I.      The Distribution of Ebooks Generally.**

The popularity of smaller, lightweight electronic devices with relatively large screens now have made ebooks one of the standard ways by which books are distributed to American consumers.  Although sales of printed books still outpace ebook sales overall, the market for the latter is well established.  Ebook sales are separately tracked, there are ebook bestseller lists, libraries lend ebooks and, in some instances, titles by popular authors are released first in ebook form and, sometimes, only in that form.  *See, e.g.*, New York Times Bestseller List for Ebook Fiction, *available at* http://www.nytimes.com/best-sellers-books/e-book-fiction/list.html; Geoffrey A. Fowler, *Why the Public Library Beats Amazon—for Now*, WALL STREET JOURNAL (Aug. 12, 2014), *available at* http://www.wsj.com/articles/why-the-public-library-beats-amazonfor-now-1407863714.

Ebooks are popular for multiple reasons:  they can be less expensive to produce and purchase; many can be stored on a single device; multiple devices can be used to read them (such as a lightweight PC, computer, tablet or cell phone); and because their digital nature does not require actual shelf space, libraries and stores are able to make countless book titles more accessible to the reading public.  *See* Mark Ciampa et al., *Is acceptance of e-textbooks discipline-*

2

*dependent? Comparing business and non-business student perceptions*, RES. IN HIGHER EDUC. J. (June 2013).

Ebooks also have made it much easier for authors to publish their works, including through self-publishing. *See* THE ECONOMIST, *Essay - The Future of the Book*, ch. III (Oct. 11, 2014), *available at* http://www.economist.com/news/essays/21623373-which-something-old-and-powerful-encountered-vault. Indeed, the media has reported that some authors have abandoned contracts with publishing houses in lieu of the simpler route of self-publishing. *See* Jeremy Greenfield, *When Self-Published Ebooks Become Bestsellers*, FORBES (Dec. 3, 2012), *available at* http://www.forbes.com/sites/jeremygreenfield/2012/12/03/when-self-published-ebooks-become-best-sellers/.

The growth of self-publishing has led to a dramatic increase in the overall number of titles now available to consumers. *See* Alison Flood, *Self-publishing boom lifts sales by 79% in a year*, THE GUARDIAN (June 13, 2014), *available at* http://www.theguardian.com/books/2014/jun/13/self-publishing-boom-lifts-sales-18m-titles-300m. Some initially self-published ebooks have become so popular that they have transitioned to print and enjoy bestseller status in both formats. *See* Sarah Fay, *After 'Fifty Shades of Grey,' What's Next for Self-Publishing?*, THE ATLANTIC (Apr. 2, 2012), *available at* http://www.theatlantic.com/entertainment/archive/2012/04/after-fifty-shades-of-grey-whats-next-for-self-publishing/255338/.

Another unique aspect to ebooks is that the process of bringing them to market is largely automated and very quick. In addition to traditional publishing houses, online publishers such as Smashwords, Inc. ("Smashwords") now also make multiple ebook titles available. In the case of Smashwords, it not only has its own website, www.smashwords.com, where it publishes and

3

distributes ebooks of its authors directly to the public, but it also distributes those works through online retailers such as Apple.  In this way, Smashwords, and digital ebook retailers like it, offer the public easier and faster access to a wider selection of books as compared to physical bookstores.

Smashwords uses a process by which authors upload their finished manuscripts to the Smashwords website with a click of a button.  Smashwords' software then automatically converts the manuscript to ebook format and immediately publishes the formatted ebook to its website.  *See* Declaration of Mark Coker in Support of Apple Inc.'s Motion for Summary Judgment ("Coker Decl.") ¶¶ 4-6.  To qualify for broad retail distribution beyond the Smashwords website – such as through an online retailer like Apple's iBooks Store – an ebook also must pass an additional Smashwords vetting process.  *Id*.  Only books vetted and accepted into the Smashwords Premium Catalog qualify for automatic distribution to Apple.  *Id.*

## II.     The Distribution of *Gronking* by Apple.

Mr. McKenna uploaded *Gronking* to Smashwords on December 29, 2014, using a cover image consisting of photographs of Rob Gronkowski and a young couple embracing (the "Original Cover").  *See* Declaration of Greg McKenna in Support of Defendants' Motions for Summary Judgment ("McKenna Decl.") ¶¶ 1, 3, Exhibit ("Ex.") 1; Coker Decl. ¶ 7, 9, Ex. 3. Smashwords made it available on the Smashwords website on December 29, 2014.  *See* Coker Decl. ¶ 9.  *Gronking*, however, was not immediately delivered to Smashwords' partner online bookstores; instead, it was rejected by the Smashwords Premium Catalog vetting process due to violations of Smashwords' formatting policies because it included hyperlinks to other retailers. *See* Coker Decl. ¶ 10, Ex. 2.  Around the same time – and unbeknownst to Smashwords or Apple – Mr. McKenna learned that Amazon.com, Inc. ("Amazon") had received a complaint about the

use of certain logos and a patch with the letters "MHK" that appeared on Mr. Gronkowski's uniform.  *See* McKenna Decl. ¶ 6, Ex. 2.

After the rejection of *Gronking* by Smashwords and in response to the complaint, Mr. McKenna edited (1) the text of the book to remove the links and (2) the Original Cover of *Gronking* to redact certain logos and trademarks that appeared on Gronkowski's uniform.  *See* Coker Decl. ¶ 11, Exs. 2, 4; McKenna Decl. ¶ 7, Ex. 3.  It was not until January 12, 2015 that Smashwords accepted the revised version of *Gronking* (including the new cover) into its Premium Catalog and delivered it to Apple.  *See* Coker Decl. ¶ 11, Ex. 2.

After Smashwords initially delivered *Gronking* to Apple, Mr. McKenna made additional changes to the cover image.  The first was made on January 13, 2015, modifying the previous photograph of Rob Gronkowski to make it look like a drawing.  *See* Coker Decl. ¶ 12, Ex. 5; McKenna Decl. ¶ 8, Ex. 4.  Smashwords accepted the revised cover into the Premium Catalog and delivered it to Apple on January 13, 2015, where it became available through the iBooks Store on the same day.  *See* Coker Decl. ¶ 12, Ex. 2.  When Smashwords delivered to Apple the EPUB file with the revised cover, that revised cover replaced the original cover on the iBooks Store listing for *Gronking*, and was included in any subsequent downloads of *Gronking*.  *See* Declaration of Alessandra Aliquo in Support of Apple Inc.'s Motion for Summary Judgment ("Aliquo Decl.") ¶ 5.

Mr. McKenna received a cease-and-desist letter from counsel for the Roes on January 29, 2015.  *See* McKenna Decl. ¶ 9, Ex. 5.  In response, on January 30, 2015, Mr. McKenna again changed the cover image of *Gronking*.  This time, Mr. McKenna replaced the photograph of the Roes with one of a different young couple that he had licensed from a stock photography website.  *See* McKenna Decl. ¶ 9, Ex. 6; Coker Decl. ¶ 14-15, Ex. 7.  Smashwords accepted the

revised version into the Premium Catalog on February 1, 2015, and delivered it to Apple on the same day.  Coker Decl. ¶¶ 14-15.  This revised cover replaced the previous cover on the iBooks Store listing for *Gronking*, and was included as the cover for any subsequent downloads of *Gronking*.  *See* Aliquo Decl. ¶ 5.  At the time Mr. McKenna uploaded the revised book to Smashwords, he did not inform either Smashwords or Apple of the letter from Roes' counsel or the allegations contained in it.  *See* McKenna Decl. ¶ 10; Coker Decl. ¶¶ 18, 21-22; Aliquo Decl. ¶ 9.

The undisputed facts make absolutely clear that Apple had no input into *Gronking*'s covers.  It did not create, edit, alter, modify, or otherwise have anything to do with them.  *See* Aliquo Decl. ¶ 6.  Instead, Apple served solely as a distributor of the book.  Moreover, Apple never advertised *Gronking* or otherwise used the cover images apart from showing consumers that the book was available in the iBooks Store.  *See* Aliquo Decl. ¶ 8.  The only publicity that *Gronking* received upon its launch was generated not by Apple, but by the mainstream media, which found the book's placement of well-known football player Rob Gronkowski in fictional erotic situations to be newsworthy.

On February 6, 2015 – days after Mr. McKenna had removed the Roes' photo from *Gronking*'s cover – Apple received a cease-and-desist letter from the Roes' counsel.  *See* Aliquo Decl. ¶ 9, Ex. 3.  Apart from that letter, Apple had no knowledge, or reason to know, of the Roes' objections to any of the book covers.  *See* Aliquo Decl. ¶ 9.  Indeed, neither Mr. McKenna nor Smashwords previously had communicated with Apple about *Gronking*.  *See* McKenna Decl. ¶ 10; Coker Decl. ¶ 22.  In fact, had Smashwords received a cease-and-desist letter from plaintiffs' counsel, it would have been obligated to notify Apple about it.  *See* Coker Decl. Ex. 1 at ¶ 3(g).

Nevertheless, on February 24, 2015 – nearly a month after Mr. McKenna had removed the Roes' photograph from the cover and without any further notice to Apple – the Roes filed a complaint in the Court of Common Pleas of Miami County, Ohio.  The Complaint alleges that the defendants' use of the Roes' image was unauthorized and therefore is a:  (1) violation of Ohio's right of publicity statute, Ohio Rev. Code § 2741, Compl. ¶¶ 1-11 [Doc. No. 7, PageID 47-48]; (2) a common law tort under Ohio law, Compl. ¶¶ 12-15 [Doc. No. 7, PageID 48-49]; and (3) a violation of the Restatement of Torts § 652,[1] Compl. ¶¶ 16-17 [Doc. No. 7, PageID 49]. This action was timely removed to this Court on March 27, 2015.

<strong>Argument</strong>

**I.      The Standard for Summary Judgment.**

Summary judgment dismissing the Complaint as against Apple with prejudice should be granted because there are no disputed issues of material fact as to Apple's limited role as a distributor of *Gronking*.  This entitles Apple to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Wood v. Plummer*, 940 F. Supp. 2d 636, 640-41 (S.D. Ohio 2013) (Rose, J.).  The governing substantive law, as applied to the undisputed material facts, precludes liability from being imposed on Apple as to each of the Roes' common law and statutory claims.

---

[1]      The Restatements are not themselves laws that can be violated – they are summaries of the law prepared by Reporters selected by the American Law Institute.  The section of the Restatement of Torts referred to in the Complaint summarizes the common law regarding the unauthorized use of an individual's name and likeness for commercial purposes.

**II.      The First Amendment Protects Distributors Of Literary Works From Tort Claims Based On Their Mere Distribution Of Such Works.**

Over fifty years ago, in *Smith v. California*, 361 U.S. 147 (1959), the Supreme Court held

that the First Amendment protects bookstores (as opposed to authors) from liability for simply

making a book available to the public.  The rationale for that holding was that:

> [C]onstitutional guarantees of the freedom of speech and of the
> press stand in the way of imposing [such liability] on the
> bookseller.

361 U.S. at 152-53.

Any other rule, the Court explained, would place every bookstore under an obligation to

be aware of the contents of each book in the shop.  Given the number of books stocked even by a

small bookstore, that not only creates an unreasonable burden on the book distributor, but also:

> [T]he bookseller's burden would become the public's burden, for
> by restricting him the public's access to reading matter would be
> restricted.  If the contents of bookshops and periodical stands were
> restricted to material of which their proprietors had made an
> inspection, they might be depleted indeed. . . .  The bookseller's
> self-censorship . . . would be a censorship affecting the whole
> public.

*Id.* at 153-54.

Application of this critically important constitutionally required limitation on distributor

liability has been widely applied to preclude liability for a variety of civil tort claims, such as

defamation, *Lewis v. Time Inc.*, 83 F.R.D. 455, 463-64 (E.D. Cal. 1979) (libel claim against

distributor of *Time* magazine rejected); invasion of privacy, *Lerman v. Flynt Distrib. Co.,* 745

F.2d 123, 139 (2d Cir. 1984) (First Amendment barred claims against national distributor of

hundreds of periodicals); right of publicity, *Stern v. Delphi Internet Servs. Corp.,* 626 N.Y.S.2d

694, 697-98 (N.Y. Sup. Ct. 1995) (First Amendment protected defendant's electronic bulletin

board service from right of publicity claims); and even breach of implied warranty, *Cardozo v.*

*True*, 342 So. 2d 1053, 1056 (Fla. Dist. Ct. App. 1977) (holding it was "unthinkable" that retail book store had duty to examine recipe in cookbook that allegedly injured plaintiff), in multiple jurisdictions across the country.  Courts consistently have recognized that the First Amendment-based rule announced in *Smith* "protects libraries and vendors of books, magazines, and newspapers" from tort claims when their only connection to a book is "the activity of selling or distributing" it.  *Osmond v. EWAP, Inc.*, 153 Cal. App. 3d 842, 853 (Cal. Ct. App. 1984).  As explained by the court in *Cardozo*:

> The common theme running through these decisions is that ideas hold a privileged position in our society.  They are not equivalent to commercial products.  Those who are in the business of distributing ideas of other people perform a unique and essential function.  To hold those who perform this essential function liable, regardless of fault, when an injury results would severely restrict the flow of the ideas they distribute.

*Cardozo*, 342 So. 2d at 1056-57.  *See Cubby, Inc. v. Compuserve Inc.,* 776 F. Supp. 135, 139-41 (S.D.N.Y. 1991) ("The requirement that a distributor must have knowledge of the contents of a publication before liability can be imposed for distributing that publication is deeply rooted in the First Amendment."); *see also Lewis*, 83 F.R.D. at 463 ("no lesser standard could pass muster").

The reasoning and principles underlying *Smith*, announced in the context of a traditional, 1950s-era brick-and-mortar bookstore, apply with equal, if not greater, force to modern-era online versions of bookstores.  The massive volume of material in an online environment can vastly exceed even the largest real-world bookstore, and the process of acquiring that content is now largely automated.  As a result, the "burdens" about which *Smith* was concerned – as well as the benefits from broader public access to literary works – have increased exponentially.  *Parisi v. Sinclair* is instructive.  *See* 774 F. Supp. 2d 310, 319 (D.D.C. 2011).  There, the court rejected defamation claims against Amazon and Barnes & Noble, Inc. that were based solely on their

9

distribution of a book because there was no evidence that either retailer knew about the book's allegedly defamatory contents. Citing the actual malice standard, the court expressly adopted *Smith*'s rationale and held that retailers had no duty to investigate the book's contents because such a requirement would "impose a tremendous burden on distributors" and that burden, in turn "would become the public's burden" by limiting the public's access to reading material. *Id.* (internal citations omitted). Even receipt of a cease-and-desist letter failed to trigger a duty to investigate because the letter arrived only *after* the distribution of the book. *Id.* at 320. *See also Stern,* 626 N.Y.S.2d at 697 (citing *Cubby* in rejecting right of publicity claims because defendant's "on-line service must be analogized to distributors such as news vendors, bookstores and libraries," entitling it to the "same First Amendment protections").

The limited role of distributors such as bookstores in making available a large volume of books, newspapers, or magazines to the public distinguishes them from authors or others directly responsible for the creation of particular content. For that reason, authors do not enjoy the same protections from liability as distributors under *Smith.* *See Peck v. Tribune Co.*, 214 U.S. 185, 189 (1909) ("Whenever a man publishes, he publishes at his peril.") *Cf. ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 925 (6th Cir. 2003) (in defending against common law right of publicity claims, "[p]ublishers disseminating the work of others who create expressive materials also come wholly within the protective shield of the First Amendment"); *Sandler v. Calcagni*, 565 F. Supp. 2d 184, 195 (D. Me. 2008) (self-publisher not liable for defamation or invasion of privacy where it had "minimal involvement with the author" of the book); *Cabaniss v. Hipsley*, 151 S.E.2d 496, 506-07 (Ga. Ct. App. 1966) (misappropriation of likeness claim could not stand where a magazine was "merely the conduit" for advertisement that was received "without any

knowledge of the appropriation," and where the "appropriation of plaintiff's photograph did not inure to [the magazine's] benefit, use or advantage, but to that of [its] advertiser").[2]

These cases, which distinguish between, on the one hand, distributors of content such as books and magazines, and, on the other, those who create such content, highlight the fatal defect in the Roes' claims: They allege that Apple played no role other than to distribute *Gronking* and they could not truthfully allege more. *See* Compl. ¶ 3 [Doc. No. 7, PageID 47]. According to the Complaint, *Gronking* was written "and caused to be published" solely by defendant Greg McKenna. *Id.*

This is completely accurate, as the undisputed record confirms. Nothing about Apple's distribution of *Gronking* distinguished it from the millions of other books that Apple makes available to the public through its iBooks Store. *See* Aliquo Decl. ¶ 9. In particular, Apple had no knowledge about the Roes' objections to the versions of the book cover that depicted them, which were available on the iBooks Store only for a brief, approximately three-week period. *See* Aliquo Decl. ¶ 9.

By the time Apple received a letter from the Roes' counsel on February 6, 2015, Mr. McKenna already had removed the Roes' photograph from the cover. *See* McKenna Decl. ¶ 9, Ex. 6. The record shows that, until then, Apple could not possibly have had reason to know of the Roes' objections to the cover. *See* McKenna Decl. ¶ 10; Coker Decl. ¶ 22. Indeed, under *Parisi*, even the receipt of a cease-and-desist letter would not have triggered any obligation on Apple's part to investigate the book. It is undisputed that Apple played no role in creating the

---

[2]   Authors or creators of content may have defenses under Ohio law, which expressly safe harbors from right of publicity claims literary works and other works entitled to First Amendment protections. To the extent someone creates content, however, that role is direct, significant and plainly unlike that of the ordinary book distributor. Therefore, even where liability might lie against others, claims against bookstores for simply distributing a book to the public should be dismissed.

cover images, that Smashwords was responsible for uploading *Gronking* to the iBooks Store, and that it did so pursuant to representations that *Gronking* did not infringe the intellectual property rights of any other party. *See* Aliquo Decl. ¶ 6; Coker Decl. ¶¶ 4-6, 20, Ex. 1 at ¶ 1(a); *see also Barrett v. Rosenthal*, 40 Cal. 4th 33, 55 (Cal. 2006) (observing that a corollary rule to distributor liability is that, because "liability [] only arise[s] upon notice," the potential damages available are "limited to those accruing after the provider became aware of the defamatory [or otherwise infringing] character of a message").

Simply stated, this is a classic case for application of *Smith*: Apple did no more than distribute *Gronking* and, in doing so, displayed the cover image provided by Smashwords (who received it from Mr. McKenna) without any involvement in its selection or publication. Apple's offering of *Gronking* in its iBooks Store was no different than a typical bookstore's placing a book on its shelves for its customers. Because there is no genuine dispute that Apple simply served as a distributor of *Gronking,* it lacked knowledge, or any reason to know, of the Roes' objection to the cover of *Gronking*, *see Parisi,* 774 F. Supp. 2d at 319, and the claims against it should be dismissed.

## III. The Incidental Display Of A Book Cover In Connection With The Sale Of A Book Is Neither A Right Of Publicity Violation Nor An Invasion Of Privacy.

A right of publicity violation, whether under the common law or Ohio's right of publicity statute, requires, as an element of the offense, a direct effort to capitalize on the commercial value of a person's image or name. *See ETW*, 332 F.3d at 930 (noting Ohio courts follow the Restatement (Third) of Unfair Competition § 46 in requiring an "appropriat[ion] [of] the *commercial value* of a person's identity") (emphasis added); *Reeves v. Fox Television Network*, 983 F. Supp. 703, 710 (N.D. Ohio 1997) (under Ohio common law, defendant must have "appropriated to his own use or benefit the reputation, prestige, social or commercial standing,

12

public interest or other values of the plaintiff's name or likeness"); *Kolcun v. Nationwide Ins. Co.*, No. C2-04-CV-1079, 2006 WL 1447299, at *10 (S.D. Ohio May 24, 2006) (observing that Ohio's right of publicity statute requires that plaintiff's "persona" both have "commercial value" and be used for a "commercial purpose") (citing Ohio Rev. Code § 2741.01(A)-(B)) (internal quotation marks omitted).

According to the Roes' own complaint, they cannot satisfy the requirements of either the common law or statutory right of publicity torts.  The Complaint alleges that:  (1) the Roes are private persons whose interests in remaining anonymous trump the presumption in favor of open judicial proceedings, Compl. ¶ 1 [Doc. No. 7, PageID 47]; and (2) Apple's only act was to distribute the book, making it available digitally in the same way that a traditional, brick-and-mortar bookstore makes books available by placing them on its shelves, *see* Compl. ¶ 3 [Doc. No. 7, PageID 47].

As to the first element, whether the Roes have any commercial value in their identities to exploit, the Complaint alleges that the Roes would like to prevent their likenesses from "further public disclosure" because they originally placed the photograph on the Internet without any contemplation of its commercial use.  *See* Compl. ¶¶ 1, 4 [Doc. No. 7, PageIDs 47-48].  That they are private individuals who never have exploited their personas for commercial purposes is the very reason they have filed this action as "John and Jane Roe" as opposed to using their actual names.  *See* Compl. ¶ 1 [Doc. No. 7, PageID 47].  Completely lacking from the Complaint is any allegation of why or how the plaintiffs' likenesses have commercial value.  Indeed, the Roes' attempt to anonymously proceed with their right of publicity claims dooms the claims because Ohio law requires that, "in order to state a cause of action for invasion of privacy by appropriation, the complaint must allege that plaintiff's name or likeness has some intrinsic

13

value, which was taken by defendant for its own benefit." *Reeves*, 983 F. Supp. at 710; *see also Jackson v. Playboy Enters., Inc.*, 574 F. Supp. 10, 13 (S.D. Ohio 1983) (appropriation of likeness claim dismissed where "Plaintiffs have not given any indication that their likenesses have value in and of themselves which could be taken by someone else for his or her benefit").

As to the second element, the direct exploitation of the likeness for a commercial purpose, the law is well settled that, when a distributor of books (or other products) does no more than stock a product manufactured by another that happens to display someone's likeness, that element is not present. Such uses do not trigger liability because they do not involve the requisite act of capitalizing on an individual's commercial likeness.

To take one example, if an athlete objected to being featured on the front of a box of Wheaties without permission, a supermarket could not be liable simply for placing a box of that cereal on its shelf, facing the aisle. That is because the supermarket's "use" of the athlete's image would be incidental to its sale of the cereal and not an attempt to trade on the commercial value of the athlete's persona. Such incidental uses are not actionable. *See Vinci v. Am. Can Co.,* 591 N.E.2d 793, 794 (Ohio Ct. App. 1990) (incidental use of athlete's image on promotional materials for cups, with no implication of endorsement, was not actionable).

Here, Apple displayed the Roes' image in a way that "closely simulate[d] a customer's experience browsing book covers in a traditional book store," and thus any use of the plaintiffs' image was merely incidental to the distribution of *Gronking*. *Almeida v. Amazon.com, Inc.,* 456 F.3d 1316, 1325-26 (11th Cir. 2006). The Roes have therefore failed to allege an essential element of their right of publicity claim.

*Almeida* is directly on point. There, the Eleventh Circuit held that when a book cover is shown as part of a book-browsing experience, the "use" of images on the cover are incidental

14

and, therefore, non-actionable.  *Id*. (Amazon displayed plaintiff's image only to "replicate[] the bookstore experience" for online customers).

 This incidental use exception repeatedly has been affirmed by both Ohio Courts and the Sixth Circuit.  *See Zacchini v. Scripps-Howard Broad. Co*., 351 N.E.2d 454, 458 (Ohio 1976) (distinguishing "the mere incidental use of a person's name and likeness, which is not actionable, from appropriation of the benefits associated with the person's identity, which is") *rev'd on other grounds and remanded*, 433 U.S. 562 (1977)); *Moore v. Weinstein Co*., 545 F. App'x 405, 408 (6th Cir. 2013) ("The right of publicity does not proscribe 'use of a person's identity in… entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses…'") (quoting the Restatement (Third) of Unfair Competition § 47); *Reeves*, 983 F. Supp. at 710 (N.D. Ohio 1997) (plaintiff must allege "something more than the incidental publication of his name or likeness"); *see also* Ohio Rev. Code § 2741.09(A)(1)(d) (expressly safe harboring from right of publicity claims advertising that is incidental to the sale of literary or other works protected by the First Amendment).

 It is important to distinguish between the *author's* decision to create *Gronking*'s cover, from any incidental "use" by Apple.  When *Gronking* was delivered to Apple, it simply "opened" the digital shipment and "stocked" the book on the "shelves" of the iBooks Store.  *See* Aliquo Decl. ¶ 3.  Indeed, the Roes' only factual allegation with respect to Apple is that it distributed *Gronking* to the public.  Compl. ¶ 3 [Doc. No. 7, PageID 47].  The Complaint alleges no separate effort by Apple to capitalize on the Roes' identity and none could truthfully be alleged.  Apple displayed the Roes' image just as it did every other book cover it displays: solely to communicate that *Gronking* was available on the iBooks Store.  *See Almeida*, 456 F.3d at 1326.  Not only was the original book cover available for a short period of time, but the

15

original cover also was never displayed except when a potential consumer chose to search for the book.[3]  *See* Aliquo Decl. ¶ 8.  The Roes fail to plead any facts alleging that Apple's display of the book cover differed at all from the purely incidental manner in which a traditional bookstore displays books on its shelves.  To the contrary, they plead only that Apple "offered the book for sale."  Compl. ¶ 3 [Doc. No. 7, PageID 47].  Such allegations fail to make out either an invasion of privacy or right of publicity claim under Ohio law, and these claims therefore should be dismissed.

\* \* \* \* \*

Summary judgment is the favored remedy for free speech cases, because protracted litigation has a "chilling effect" on the exercise of First Amendment rights.  *Osmond*, 153 Cal. App. 3d at 854 (citing *Dombrowski v. Pfister*, 380 U.S. 479 (1965)).  In cases like this, where claims are asserted against those in the distribution chain who distribute to countless individuals, "self-censorship carries potentially more pervasive consequences."  *Lewis*, 83 F.R.D. at 465; *see also Smith*, 361 U.S. at 153.  "Because of the special role the distributor plays [in society], it is, if anything, even more critical to dispose of meritless cases at the outset," absent a showing of "specific allegations of facts concerning actual knowledge or facts giving rise to a duty to investigate."  *Osmond*, 153 Cal. App. 3d at 855 (citing *Time Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir. 1969)).

---

[3]  Because *Gronking* was classified as erotica, its cover was not displayed through a consumer's normal browsing of the iBooks Store.  Instead, the cover would be displayed only in response to certain searches, and only if parental controls were not enabled.  *See* Aliquo Decl. ¶ 8.

**Conclusion**

For the foregoing reasons, summary judgment should be granted dismissing with

prejudice the Complaint against Apple.


Dated:  June 3, 2015                              Respectfully submitted,
Columbus, Ohio


                                                  /s/ John W. Zeiger
James J. Pastore (admitted *pro hac vice*)         John W. Zeiger (0010707), Trial Attorney
Jeffrey P. Cunard (*pro hac vice* application to be   Daniel P. Mead (0083854)
submitted)                                         ZEIGER, TIGGES & LITTLE LLP
DEBEVOISE & PLIMPTON LLP                            3500 Huntington Center
919 Third Avenue                                   41 South High Street
New York, New York 10022                           Columbus, Ohio 43215
(212) 909-6000                                     (614) 365-9900
(Fax) (212) 909-6836                               (Fax) (614) 365-7900
jjpastore@debevoise.com                            zeiger@litohio.com
jpcunard@debevoise.com                             mead@litohio.com


                                                  *Attorneys for Defendant Apple Inc.*

17

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 3rd day of June, 2015, a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, and notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

/s/ John W. Zeiger
John W. Zeiger (0010707), Trial Attorney