**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| JOHN ROE, et. al., | : | |
| | : | Case No. 3:15-cv-00111 |
| Plaintiffs, | : | |
| -vs- | : | U.S. Dist. Judge Thomas M. Rose |
| | : | |
| AMAZON.COM, INC., et. al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**JOINT REPLY IN SUPPORT OF DEFENDANTS BARNES & NOBLE, INC.'S
AND SMASHWORDS, INC.'S MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ii

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT .................................................................................................................................2

I.  Federal Law Completely Protects the Corporate Defendants' Distribution and Sale
    of McKenna's Book ..........................................................................................................2

    A.  The First Amendment Prohibits Imposing Liability on Defendants .........................2

        1.  The Corporate Defendants Did Not Create or Edit Gronking ......................3

        2.  Defendants Did Not Know or Have Reason to Know that
            McKenna Lacked Permission to Use Plaintiffs' Image on the Cover
            of His Book ...................................................................................................6

        3.  Plaintiffs' Proposed Duty to Investigate Would Chill Speech .....................7

    B.  The Communications Decency Act of 1996 Bars Plaintiffs' Claims ........................8

II. The Undisputed Facts Do Not Support Any Cause of Action Against Defendants
    Under Ohio Law ...............................................................................................................11

    A.  Defendants Had No Constructive Knowledge and the Ohio Supreme Court
        Has Rejected Plaintiffs' Joint Concert Theory of Liability ....................................11

    B.  By Declaring That Their Personas Had No Commercial Value, Plaintiffs
        Negate an Essential Element of Their Claims .........................................................14

    C.  Defendants Did Not Make Commercial Use of Plaintiffs' Image ...........................15

        1.  Defendants Did Not Capitalize on Plaintiffs' Identities ..............................16

        2.  The Record Contains No Evidence to Support a Claim for Invasion
            of Privacy by False Light Publicity ..............................................................18

CONCLUSION .............................................................................................................................20

i

# TABLE OF AUTHORITIES

**Cases**

*Almeida v. Amazon.com, Inc.*,
   456 F.3d 1316 (11th Cir. 2006) ..............................................................16, 17, 18

*Andonian v. A. C. & S., Inc.*,
   97 Ohio App. 3d 572 (Summit 1994) .....................................................13

*Ashby v. Hustler Magazine, Inc.*,
   802 F.2d 856 (6th Cir. 1986) ..................................................................18, 20

*Bash v. Textron Fin. Corp.*,
   483 B.R. 630 (N.D. Ohio 2012) ..............................................................12, 13

*Botts v. N.Y. Times Co.*,
   2003 U.S. Dist. LEXIS 23785 (D.N.J. Aug. 29, 2003)...........................19

*Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
   519 F.3d 666 (7th Cir. 2008) ..................................................................9

*Compuware Corp. v. Moody's Investors Servs.*,
   371 F.Supp. 2d 898 (E.D. Mich. 2005) ..................................................7

*DeVries Dairy, LLC v. White Eagle Coop Ass'n., Inc.*,
   132 Ohio St. 3d 516 (2012) ....................................................................12

*Duha v. Agrium, Inc.*,
   448 F.3d 867 (6th Cir. 2006) ..................................................................6

*ETW Corp. v. Jireh Publ'g, Inc.*,
   332 F.3d 915 (6th Cir. 2003) ..................................................................16

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*,
   443 F.2d 1159 (2d Cir. 1971) .................................................................13

*Hambleton v. RG Barry Corp.*,
   12 Ohio St. 3d 179 (1984) ......................................................................12

*Hunter v. Sec'y of United States Army*,
   565 F.3d 986 (6th Cir. 2009) ..................................................................12

*Info-Hold, Inc. v. Muzak LLC*,
   2013 U.S. Dist. LEXIS 32238 (S.D. Ohio Mar. 8, 2013).......................6

*James v. Bob Ross Buick*,
    855 N.E.2d. 119 (2d Dist. Ohio 2006) ...........................................................15, 16

*Jones v. Dirty World Entm't Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) ....................................................................7, 9, 10

*Kolcun v. Nationwide Ins. Co.*,
    No. C2-04-CV-1079, 2006 U.S. Dist. LEXIS 32835 (S.D. Ohio May 24, 2006) ..................14

*Lerman v. Flynt Distributing Co.*,
    745 F.2d 123 (2d Cir. 1984) ...................................................................................7

*Maynard v. Port Publications*,
    297 NW 2d 500 (Wis. S.Ct. 1980) .....................................................4, 5, 7, 12, 13

*Misut v. Mooney*,
    124 Misc. 2d 95 (N.Y.S. 1984) ...........................................................................7, 8

*Parlin Fund LLC v. Citibank N.A.*,
    No. 1:13-CV-111, 2013 WL 3934997 (S.D. Ohio July 30, 2013) ....................................12, 13

*Patrick v. Cleveland Scene Publ'g*,
    582 F. Supp. 2d 939 (N.D. Ohio 2008) ...............................................................18, 19

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ...........................................................................13

*Reeves v. Fox TV Network*,
    983 F.Supp. 703 (N.D. Ohio 1997) .....................................................................14, 16

*Sandler v. Calcagni*,
    565 F.Supp. 2d 184 (D.Me. 2008) ........................................3, 4, 8, 12, 16, 17, 18

*Smith v. California*,
    361 U.S. 147 (1959) ...........................................................................................7

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) .................................................................................3

*Viacom v. YouTube*,
    676 F.3d 19 (2d Cir. 2012) ...............................................................................5, 12

*Welling v. Weinfeld*,
    113 Ohio St. 3d 464 (2007) .................................................................................18

**Statutes**

The Communications Decency Act of 1996, 47 U.S.C.

    § 230 ...............................................................................................................8

    § 230(c)(1) ...............................................................................................9, 10

    § 230(e)(3) .....................................................................................................10

Fed. R. Civ. P. 56(c)(1)(A) .................................................................................12

R.C. Chapter 2741 ..........................................................................11, 13, 14, 17, 19

17 U.S.C. § 512(c)(1)(A)(iii) ...............................................................................5

**Other Authorities**

3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.04[A][3][a] ...................13

Restatement Second of Torts

    § 652C cmt. c ................................................................................................14

    § 652E ..........................................................................................................18

    § 876 .....................................................................................................12, 13

Defendants Barnes & Noble, Inc. and Smashwords, Inc. (together the "Corporate Defendants" or "Defendants") respectfully submit this joint reply in support of their motions for summary judgment.

## PRELIMINARY STATEMENT

Greg McKenna, writing as Lacey Noonan ("McKenna"), is the publisher and author of the self-published book, *A Gronking to Remember* (the "Book"). As the publisher, McKenna edited, priced, formatted, and selected and created art for the Book, over which he retained full editorial control. He also authored all of the Book's text.

McKenna published his Book using several self-publishing platforms including Barnes & Noble's NOOK Press and that of Smashwords. These platforms provide distribution channels to self-publishers who have written, edited, and designed their books. McKenna used the Corporate Defendants' tools to distribute his Book after representing that he held all necessary rights. The Corporate Defendants undisputedly did not create or edit, or hold themselves out as creating or editing—or having any control over—the content McKenna chose to incorporate into the Book and its cover. In using their self-publishing services, McKenna joined a technological revolution that has dramatically increased the number of titles available to the public. Today, digital distribution has brought to market many self-published books that would not have been released traditionally due to resource constraints, including printing costs and lack of physical space. Self-publishing authors have embraced digital distribution as a modern-day alternative to the traditional publishing house model.

In this litigation, Plaintiffs seek to hold Barnes & Noble and Smashwords liable for "***acting as*** book publishers." Plaintiffs' Memorandum in Opposition to Motions for Summary Judgment, ECF No. 51 ("Opp."), at 9-10 (emphasis added). The crux of their argument is that

1

Barnes & Noble and Smashwords should have investigated and discovered that McKenna did not have the rights to publish Plaintiffs' image on the cover of the Book.  *See* Opp. at 4.

Plaintiffs' litigation position is irreconcilable with reality.  The Corporate Defendants are not (and are not obligated to be) traditional publishers.  Nor was there anything about Plaintiffs' photograph that would have raised concerns for anyone, traditional publishers included.  Perhaps most importantly, the duty that Plaintiffs claim the Corporate Defendants breached—to investigate rather than accepting McKenna's representations when nothing called them into question—simply does not exist; not for traditional publishers, and certainly not for the Corporate Defendants.  In Plaintiffs' world, self-publishing cannot exist.  Fortunately for book lovers, that is not the law.

As discussed below, under both federal and Ohio law the Corporate Defendants cannot be held liable for McKenna's acts.  Put simply, a self-publishing or other distribution platform (like the Corporate Defendants) that does not create or edit content, and has no knowledge of or reason to suspect that a book allegedly includes improper material, cannot be held liable for distributing self-published content.

Defendants' respective motions for summary judgment should be granted.

## ARGUMENT

As explained in detail below, for independent reasons under both federal and Ohio law, summary judgment is warranted.

## I.  Federal Law Completely Protects the Corporate Defendants' Distribution and Sale of McKenna's Book.

### A.  The First Amendment Prohibits Imposing Liability on Defendants.

The First Amendment carefully protects the right to distribute books.  Where a self-publishing or other distribution platform does not create or edit content, and has no knowledge of

or reason to suspect a book's improper inclusion of material, it cannot be held liable for making a book available to the public.  *See* Smashwords Memorandum in Support of Motion for Summary Judgment, ECF No. 43-1 ("Smashwords Mem."), at 14-16 (compiling authorities cited in opening briefs of Apple, Amazon, and Barnes & Noble).  *See also Sandler v. Calcagni*, 565 F. Supp. 2d 184 (D. Me. 2008).  No court has held otherwise, and Plaintiffs either ignore the controlling law discussed by Defendants or point to distinctions that make no difference.

As discussed below, Plaintiffs fail to raise a genuine issue of material fact as to whether the Corporate Defendants (1) created or edited *Gronking* or (2) knew or had reason to know that the Book contained allegedly unlawful material.  Because the Corporate Defendants indisputably did none of those things, they cannot be held liable as publishers or otherwise.  *See, e.g.*, *United States v. Apple, Inc.*, 791 F. 3d 290, 296 (2d Cir. 2015) (cited by Plaintiffs) (recognizing that Defendants' digital self-publishing platforms represent a substantial break from the "centuries-old process for producing books" of "publishing companies").

### 1.    The Corporate Defendants Did Not Create or Edit *Gronking*.

McKenna wrote *Gronking* and designed its cover; the Corporate Defendants did not write a single word of the Book or design its cover in any respect.  Plaintiffs do not disagree.  Rather, they argue that the Corporate Defendants are "publishers" (and therefore should be liable for McKenna's content) simply because they offered online tools that allowed McKenna to self-publish his manuscript and cover, Opp. 3-4, and because they informed McKenna when his work violated their Terms of Service, Opp. 5.  (Plaintiffs also argue that Defendants are liable because they entered into a "cost-sharing arrangement" with McKenna, Opp. at 5, but Plaintiffs actually cite evidence showing precisely the opposite—that Defendants receive revenue only from book

sales regardless of the costs incurred by the self-publisher.)  As discussed below, these are not grounds on which the Corporate Defendants may be held liable for McKenna's content.

*First*, offering online tools that allow authors to format their book for sale cannot possibly convert Defendants into publishers.  Plaintiffs argue that online formatting tools are like "printing on paper and binding of books."  *See* Opp. at 3 n.4 and its accompanying text; *see also id.* at 5 ("Defendants figuratively and digitally print the work . . . .").  But printing and binding a book is not enough.  Here, as in *Sandler v. Calcagni*, each Corporate Defendant "importantly" does not "undertake to edit, review or fact-check [and] has no means or way of knowing whether [unlawful] material is contained within the works that it publishes."  565 F. Supp. 2d 184, 194-95 (D. Me. 2008).  Plaintiffs try to distinguish *Sandler* by arguing that the defendant there (BookSurge) "was a mere book printer," whereas the Corporate Defendants permit authors to "make changes, format, and edit the book in the Program."[1]  Opp. at 10.  Plaintiffs elsewhere concede, however, that those two things are effectively the same.  *See id.* Opp. at 3 n.4 and its accompanying text.  Moreover, *Sandler* does not l all of the features that were then available from BookSurge, but even if the current self-publishing technology is more feature-rich than what BookSurge offered in 2008, the most this shows is that Defendants currently provide superior word processing functionality.  Under Plaintiffs' logic, Microsoft could be held liable if it supplied McKenna with word processing software.  That, of course, is not the law.

Plaintiffs also fail to distinguish (or even address) *Maynard v. Port Publications*, 297 NW 2d 500 (Wis. S. Ct. 1980), which refused to treat an author and contract printer as one in the same based on allegations that the contract printer "actively participated in the publication of an

---

[1] BookSurge is the predecessor to CreateSpace.  Although Plaintiffs originally appeared to accuse Barnes & Noble of infringement on the basis of both the NOOK Press and CreateSpace editions of the Book, the Opposition makes clear that Plaintiffs' sole basis for seeking to impose liability on Barnes & Noble is for the NOOK Press edition.

allegedly defamatory publication" and served as a "vital link in the chain of events which resulted in the publication . . . ." *Id.* at 566.  The court decided at summary judgment that the contract printer was not subject to liability because holding them liable would turn them into "censors" and make their services "more expensive," thereby "preclud[ing] the publication of small, low-budget newspapers" and "material they consider to be controversial." *Id*.  The very same type of free speech concerns are implicated here.

*Second*, Defendants cannot be held liable for author content simply because they inform authors when books allegedly violate the law.  In this case, upon receiving notice of Plaintiffs' concerns, the Corporate Defendants acted promptly to ensure that McKenna changed the image, which he had already done.  Plaintiffs try to twist that into an exercise of editorial control.  Opp. at 5.  It was not.  There is no evidence, for example, that Defendants selected the replacement cover image.  Rather, they did what a bookseller would:  determined not to place the title on their digital shelves in its contested form and contacted the responsible party.  *See* Declaration of David Bock, ECF No. 23-1 ("Bock Decl."), ¶¶ 22-24, Ex. D (describing Barnes & Noble's contacting of Noonan in response to a letter from Plaintiffs' counsel); *see also* Declaration of Mark Coker in Support of Smashwords, Inc.'s Motion for Summary Judgment, ECF No. 42-1 ("Second Coker Decl."), ¶¶ 13-19, 22, 24-26 (describing Smashwords' policing of infringements on its Terms of Service).  Far from serving as a basis to *create* liability, these efforts militate *against* liability.  *Cf. Viacom v. YouTube*, 676 F.3d 19, 30 (2d Cir. 2012) (explaining that in the context of alleged copyright infringement "the provider that gains knowledge or awareness of infringing activity retains safe-harbor protection if it 'acts expeditiously to remove, or disable access to, the material . . . .'") (citing 17 U.S.C. § 512(c)(1)(A)(iii)).

       2.      **Defendants Did Not Know or Have Reason to Know that McKenna Lacked Permission to Use Plaintiffs' Image on the Cover of His Book.**

Plaintiffs also cite no evidence suggesting that Defendants knew or had any possible reason to know that McKenna had failed to obtain Plaintiffs' permission to use their image. Plaintiffs assert that "[n]o defendant in this case checked, in reckless disregard of plaintiffs' rights, to determine if the author obtained a license or right to use the Roe's photo in this manner." Opp. at 19; *see also id.* at 17. But a litigant cannot create a dispute of fact to defeat summary judgment through unsupported attorney argument.[2]

And contrary to Plaintiffs' unsupported assertion, the record shows that Defendants ***did*** check: they obtained multiple certifications from McKenna that he had all necessary rights before he uploaded the Book (including the Plaintiffs' picture on the Book cover) for publication. *See* Declaration of Greg McKenna in Support of Defendants' Motions for Summary Judgment, ECF No. 23-7 ("McKenna Decl."), ¶¶ 16a, 16b, 16c; Bock Decl. ¶¶ 12-14; Declaration of Mark Coker in Support of Apple's Summary Judgment Motion, ECF No. 20-3 ("First Coker Decl."), ¶ 19; Second Coker Decl. ¶¶ 14-15. Plaintiffs also concede that nothing about their image would have caused a reasonable person to question McKenna's representations. Indeed, they acknowledge that "the Roes could have sold their image for many purposes including for use on the cover . . . ." Opp. at 14.

On this record, no reasonable jury could find Defendants liable. As a matter of law, Defendants were not knowledgeable or reckless and had no reason to even suspect wrongdoing.

---

[2] *See e.g.*, *Info-Hold, Inc. v. Muzak LLC*, 2013 U.S. Dist. LEXIS 32238, at *5-6 (S.D. Ohio Mar. 8, 2013) ("Attorney argument is not evidence.") (citing *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006) ("Arguments in parties' briefs are not evidence.")). Indeed, with respect to Smashwords, Plaintiffs' First Amended Complaint ("FAC") literally alleges nothing. The suggestion that the original defendants required Plaintiffs to add Smashwords to the case in perfunctory fashion, by merely amending the caption, is incredible. Opp. at 22. But regardless of whether the FAC is correctly deemed insufficient for this reason, the lack of actionable facts recited in the opposition is fatal.

Summary judgment should follow in their favor. *See, e.g.*, *Compuware Corp. v. Moody's Investors Servs.*, 371 F. Supp. 2d 898, 902 (E.D. Mich. 2005) ("[O]bjective facts may be determinative of recklessness or malice, and concerns about chilling effects strongly support the grant of summary judgment when such facts show it is warranted.").

### 3. Plaintiffs' Proposed Duty to Investigate Would Chill Speech.

Courts have refused to impose a general duty to monitor such as the one Plaintiffs posit because to do so would intolerably chill speech. *See, e.g.*, B&N Brief, ECF No. 23, at 8-9 (citing and quoting *Lerman v. Flynt Distributing Co.*, 745 F.2d 123, 139 (2d Cir. 1984) and *Smith v. California*, 361 U.S. 147, 153 (1959)); Amazon Brief, ECF No. 24-1, at 16-18. *Cf. Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) (discussing Congress's present-day legislative attempts to avoid chilling free speech on the internet). In moving for summary judgment, Defendants did not merely rely on cases recognizing that such a duty would be impracticable and would suppress speech, they also submitted declarations establishing that this would be true for them specifically. Bock Decl. ¶ 17; Second Coker Decl. ¶¶ 24, 27-28. Plaintiffs submit no evidence to the contrary. Rather, they attempt to turn Defendants' evidence on its head by arguing that the ***extent*** of Defendants' costs presents a triable issue of fact. *See* Opp. at 17-18 ("How costly is it for Defendants[?]"). That is not so.

Each of the authorities cited by Defendants decided this issue as a straight-forward policy matter. *Maynard v. Port Publications* recognized on summary judgment that contract printers "would ***of necessity*** become censors and their services would become more expensive." 297 NW 2d 500, 507 (Wis. S. Ct. 1980) (emphasis added). *Misut v. Mooney*, which Plaintiffs also ignore, expressly rejected the rule that "[a]ll concerned in publishing the libel or in procuring it to be published are equally responsible with the author," and held that imposing duties of inspection "would establish the printer as a censor," "be impractical in economic terms," and

"would be bad policy." 124 Misc. 2d 95, 99 (N.Y.S. 1984). "The resulting chilling effect could limit an author's access to printing services; or, available printers might insist on an intrusive monitoring or censorship of printed material to protect themselves from potential liability." *Id.* at 99 n.2. *Sandler v. Calcagni* ruled that "if it were required to review the volume of submissions that it receives, it 'would substantially limit the content [BookSurge] could accept or produce.'" 565 F. Supp. 2d 184, 196 (D. Me. 2008). To put it simply, as a legal matter, this question has already been asked and answered: the societal costs are too high. Defendants' supporting evidence confirms this reality. Bock Decl. ¶ 17; Second Coker Decl. ¶¶ 24, 27-28.

Even if the Court were considering this question in the first instance, requiring the submission and review of documentary evidence concerning the rights in every photograph used in a self-published book would create an extraordinary, unconstitutional, and socially unproductive burden on the ability of Defendants to act as intermediaries in the book publishing process. It is not clear what documentary evidence Plaintiffs wish to force Defendants to require. Self-published authors often use intellectual property, including photographs, of their own creation, so, in many cases, the only "documentation" available would be a statement from the author that he or she has the rights—which Defendants already require from users and required of McKenna. McKenna Decl. ¶¶ 15-16.

**B.      The Communications Decency Act of 1996 Bars Plaintiffs' Claims.**

The Communications Decency Act of 1996, 47 U.S.C. § 230 (the "CDA"), also immunizes the Corporate Defendants from state tort liability for the cover of McKenna's book. B&N Brief, ECF No. 23, at 6 n.2; Amazon Brief, ECF No. 24-1, at 14 n.15; Smashwords Brief, ECF No. 43-1, at 15 & 15 n.6. The CDA expressly forecloses treating Defendants as publishers for content McKenna uploaded using their computerized self-publishing platforms.

Section 230(c)(1) of the CDA makes clear that Defendants may not be held liable as publishers (or speakers) based upon content provided by McKenna.  *See* 47 U.S.C. § 230(c)(1). The statute expressly prohibits treating them "as the publisher or speaker of any information provided by" someone else.  *Id.*; *see also Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398, 408 (6th Cir. 2014) (noting that "courts have construed the immunity provisions in § 230 broadly" and "close cases . . . must be resolved in favor of immunity") (citations and internal quotation marks omitted).

Plaintiffs correctly acknowledge that Defendants are "interactive computer service providers" to which the CDA applies, and that, as a result, they have "broad immunity" under certain circumstances.  Opp. at 7.  Plaintiffs also seem to acknowledge that the CDA immunizes Defendants for all contents of McKenna's Book, while suggesting that the outcome differs for the Book's cover.  Opp. at 8.  But what is true of the Book is also true of its cover: the CDA applies and is fatal to Plaintiffs' claims.

Plaintiffs make two arguments to the contrary, and both are mistaken.  First, Plaintiffs contend that immunity under the CDA is limited to the specific factual situations that prompted Congress to enact the statute.  It is not.  The text of § 230(c)(1) applies to "information" of all kinds.  In fact, even courts adopting a more narrow interpretation than the Sixth Circuit's majority view have decisively and correctly rejected Plaintiffs' interpretation.  *See Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc*., 519 F.3d 666, 671 (7th Cir. 2008) (noting that "a law's scope often differs from its genesis" and that § 230(c)(1) covers information of all kinds including, for example, "ads for housing, auctions of paintings that may

9

have been stolen by Nazis, biting comments about steroids in baseball, [and] efforts to verify the truth of politicians' promises. . . .").[3]

Second, Plaintiffs contend that even though Defendants are interactive computer service providers, they were also simultaneously acting as book publishers, and therefore are not immune. Opp. at 9. Plaintiffs' argument is circular. They assert that Defendants are publishers because McKenna used their platforms to create and publish the Book. *Id.* at 3. But again, § 230(c)(1) covers all "information" provided by third parties—including books and book covers.

The only other fact mentioned in the Opposition that could conceivably support this argument is that Defendants had "access" to the author and authority to change the cover. *Id.* at 5-6. That may be, but interactive service providers routinely have such access and authority to remove third party content, and the law is clear that they cannot be treated as publishers on this basis. To the extent this argument would be viable under other circumstances, such as where the record creates a genuine factual issue to support allegations that a provider created content, the undisputed facts foreclose it here. *See Jones*, 755 F.3d at 410, 413-14 (reversing denial of CDA immunity and holding, as a matter of first impression, that a "material contribution to the alleged illegality of the content" is required for a provider to be liable for the creation or development of allegedly tortious information). Defendants made no contribution—material or otherwise—to

---

[3] Plaintiffs purport to make a third argument that the CDA is consistent with their Ohio statutory claim. Opp. at 9. But this argument rests on the overly narrow interpretation of § 230(c)(1) debunked above. It is well-settled that the CDA does not merely preempt state laws concerning obscenity or other specified subjects. To the contrary, it preempts *all* state claims inconsistent with § 230(c)(1), including those at issue here. *See Jones*, 755 F.3d at 406-07 (6th Cir. 2014) (observing that § 230(e)(3) prohibits causes of action and liability under state and local law that are inconsistent with § 230(c)(1)) (citations omitted).

the use of Plaintiffs' image apart from providing the platforms McKenna used to publish his book with the cover he created.

## II. The Undisputed Facts Do Not Support Any Cause of Action Against Defendants Under Ohio Law.

Based on the undisputed facts here, the Court need not decide this case on federal grounds because Defendants also cannot be held liable under Ohio common law or Ohio's right of publicity statute, R.C. Chapter 2741. The record contains no evidence to support critical elements of their state law claims, specifically that: (1) the Plaintiffs' personas had commercial or intrinsic value; (2) Defendants used their personas for a commercial purpose; or (3) Defendants had knowledge or exhibited reckless disregard towards any false statement concerning the Plaintiffs. This lack of evidence provides three independent bases upon which this Court should grant summary judgment.

### A. Defendants Had No Constructive Knowledge and the Ohio Supreme Court Has Rejected Plaintiffs' Joint Concert Theory of Liability.

Plaintiffs correctly concede that Ohio law does not support strict liability. They attempt to argue nevertheless that Defendants constructively knew that McKenna infringed the Roes' rights, *i.e.*, that Defendants "should have known" that the Roes disapproved of McKenna's use of their photograph on the cover of the Book. Opp. at 21. As noted above, Plaintiffs cite no supporting facts. Of course, there are no such facts because it is undisputed that nothing about Plaintiffs' photograph suggested a lack of authorization. Indeed, Plaintiffs admit that "the Roes could have sold their image for many purposes including for use on the cover . . . ." Opp. at 14. Thus, it was perfectly reasonable for Defendants to rely on McKenna's representations that the use was licensed. Plaintiffs therefore cannot meet the legal standard for constructive knowledge, as explained by the Ohio Supreme Court:

> If a person has knowledge of such facts as would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry, and he fails to do so, he is chargeable with knowledge which by ordinary diligence he would have acquired.

*Hambleton v. RG Barry Corp.*, 12 Ohio St. 3d 179, 181 (1984).[4] They are likewise unable to establish a triable issue for summary judgment purposes. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion ***by . . . citing to particular parts of materials in the record* . . . .**") (emphasis added); *Hunter v. Sec'y of United States Army*, 565 F.3d 986, 996 (6th Cir. 2009).

Plaintiffs' theory that Defendants should be liable for "working in concert" with McKenna, Opp. at 3, fails because the Ohio Supreme Court has already expressly rejected it. In *DeVries Dairy, L.L.C. v. White Eagle Coop. Assn., Inc.*, the federal district court certified the following question to the Ohio Supreme Court: "Under the applicable circumstances, does Ohio recognize a cause of action for tortious acts in concert under Restatement of (2d) of Torts?" 132 Ohio St. 3d 516, 516 (2012). The relevant section of the Restatement 2d of Torts discusses the liability of "Persons acting in concert." And the Ohio Supreme Court answered: "This court has never recognized a claim under 4 Restatement 2d of Torts, Section 876 (1979), and we decline to do so under the circumstances of this case." *DeVries Dairy*, 132 Ohio St. 3d at 517 (rejecting claim for "joint concert" liability); *see also Parlin Fund LLC v. Citibank N.A.*, No. 1:13-CV-111, 2013 WL 3934997, at *8 (S.D. Ohio July 30, 2013) (*DeVries* not limited to its facts); *Bash v.*

---

[4] This is essentially the same standard applied to online hosting platforms in the realm of copyright law (which Plaintiffs concede is instructive for purposes of Ohio right of publicity law). *See* Opp. at 12-13. Indeed, a platform provider must have "actual knowledge *or awareness of facts or circumstances that indicate specific and identifiable instances of infringement*" in order to be liable for copyright infringement. *Viacom Intern., Inc. v. YouTube, Inc.*, 676 F. 3d 19, 32 (2d Cir. 2012) (emphasis added). The case law cited by Defendants in their motions establishes that a provider of the means for self-publishing, such as the contract printer in *Maynard*, *supra*, or the Internet-age self-publishing platform BookSurge in *Sandler*, *supra*, must know or have reason to know of the illegal nature of an author's editorial choices to be liable for those choices. *See* Amazon Brief at 12-14 (collecting authorities).

*Textron Fin. Corp.*, 483 B.R. 630 (N.D. Ohio 2012) (same). Plaintiffs' attempt to impute McKenna's conduct to Defendants under a joint concert theory of liability accordingly fails as a matter of Ohio law.[5]

In a similar vein, Plaintiffs point to copyright law as instructive on interpretation of Chapter 2741. *See* Opp. at 12-13. But as with the rule of *Maynard* and its progeny, the doctrine of "contributory infringement" in copyright law also requires a showing of knowledge. It is well settled that contributory copyright infringement may arise only where "[a] party . . . '**with knowledge** of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another . . . .'" 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.04[A][3][a] at 12-85 (emphasis added) (quoting *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). In this context, "a computer system operator can be held contributorily liable if it has actual knowledge that specific infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." *Perfect 10, Inc. v. Amazon.com.* Inc., 508 F.3d 1146, 1172 (9th Cir. 2007). Adhering to this universal requirement of knowledge, summary judgment in favor of Defendants is appropriate.

---

[5] To the extent Plaintiffs are alleging that Defendants are liable for assisting in the publication of the Book, *see* Opp. at 10 (Defendants "actually participate in the publishing process."), if such a claim were allowed in Ohio, a showing of "knowledge" would be required. *See* Restatement Second of Torts § 876 ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . **knows** that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.") (emphasis added); *see also Andonian v. AC & S., Inc.*, 97 Ohio App. 3d 572, 574 (Summit 1994).

**B.    By Declaring That Their Personas Had No Commercial Value, Plaintiffs Negate an Essential Element of Their Claims.**

Whether they assert the common law tort of appropriation or a claim under R.C. Chapter 2741, Plaintiffs must establish "commercial" or "intrinsic" value in their persona. *See Kolcun v. Nationwide Ins. Co.*, No. C2-04-CV-1079, 2006 U.S. Dist. LEXIS 32835 at *10 (S.D. Ohio May 24, 2006); *see also Reeves v. Fox TV Network*, 983 F. Supp. 703, 710 (N.D. Ohio 1997) (to support a claim for appropriation a plaintiff "'must allege that plaintiff's name or likeness has some intrinsic value, which was taken by defendant for its own benefit, commercial or otherwise.' . . .  Plaintiff's name and likeness has no intrinsic value.  The Defendants did not include him in the 'COPS' show because of his name, personality or prestige."); *see also* Restatement (Second) Torts § 652C cmt. C.  Plaintiffs' own declarations establish the absence of any commercial or other intrinsic value in their personas as represented in the image. Specifically, they attest to no economic harm and, instead, assert only emotional and unrealized economic harms completely unrelated to their personas as represented in the image.  *See* Declaration of John Roe, ECF No. 51-13 ("John Roe Decl."), at *4 ("[W]e live in constant fear that employers, co-workers and customers will find out about the photo resulting in economic damage").  John Roe also states that the notoriety, ridicule, and embarrassment relating to the connection between himself and the Book "is effecting [his] work and [his] business" without any indication of how these business interests were originally connected to the value of his persona in an engagement photo or that these interests have been negatively impacted. *Id.*  The fear of a potential harmful effect on unrelated business interests does not establish any commercial value in the Plaintiffs' image or likeness, to them or anyone else, at the time McKenna placed their image on the cover of the Book.

14

Plaintiffs also argue that because other individuals sell images of themselves online, their persona as contained in the image must have had commercial value. Opp. at 14-15. This argument, however, would render the law's requirement of commercial value completely meaningless. Under Plaintiffs' theory, all images of anyone would necessarily have commercial value simply because images of other people are for sale. The law requires more.

The facts here, in comparison with those in *James v. Bob Ross Buick* (cited by Plaintiffs), further demonstrate why the Plaintiffs' own statements establish the absence of commercial or intrinsic value. 855 N.E.2d. 119 (2d Dist. Ohio 2006). In that case, the court found that a salesman's signature appearing on letters sent to customers had commercial value because "[i]n this context . . . personal letters are used to induce future sales to customers who have established a client relationship with the dealership." *Id.* at 123. The undisputed facts here, including the Plaintiffs' own statements, support no similar connection (or any connection at all for that matter) between the image at issue and the Plaintiffs' economic interests. Plaintiffs explain that the image was "taken to commemorate and record our wedding journey," but they make no attempt to argue—let alone establish—any connection between their wedding celebration and any commercial or intrinsic value in their personas as represented in the image or otherwise. *See* John Roe Decl. at *2. This is not a situation, for example, where Plaintiffs are celebrities whose personas might lend commercial value to an engagement photo.

### C. Defendants Did Not Make Commercial Use of Plaintiffs' Image.

In addition to requiring the existence of commercial value, Plaintiffs' claims for invasion of privacy and violation of Ohio's right of publicity statute also require evidence of ***commercial use*** of their photograph by Defendants. With respect to this requirement, the law distinguishes between "the mere incidental use of a person's name and likeness, which is not actionable, from

15

appropriation of the benefits associated with the person's identity, which is." *Bob Ross Buick, Inc.*, 855 N.E.2d at 123; *see also ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 930 (6th Cir. 2003) (Ohio's right of publicity law requires "appropriat[ion of] the commercial value of a person's identity" that is "something more than the incidental publication of name or likeness."). Plaintiffs acknowledge the need to prove commercial use and seek to establish it based upon 1) allegations that Defendants used "the book and the unexpected publicity of [the Book] to capitalize on the identity of the [Plaintiffs]" and 2) because "[n]o one at any stage checked whether the author had the right to use the photo or where he got it." Opp. at 16. Neither argument, even if true, establishes the requisite commercial use.

### 1. Defendants Did Not Capitalize on Plaintiffs' Identities.

There is absolutely no evidence that Defendants capitalized on the Plaintiffs' identities. The most Plaintiffs can show is that Defendants may have incidentally benefited from the sale of the Book—including sales of the Book with Plaintiffs' image appearing on the cover. But such incidental benefit is not actionable. *See Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1326 (11th Cir. 2006) (an internet bookseller's "use of book cover images is not an endorsement or promotion of any product or service, but is merely incidental to, and customary for, the business of internet book sales"); *Reeves*, 983 F. Supp. at 710 ("The fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of the name or likeness."); *Sandler*, 565 F. Supp. 2d at 195.

Plaintiffs make three arguments to distinguish *Almeida* and *Sandler*. *See* Opp. 10. None supports a different conclusion.

16

***First***, Plaintiffs suggest that Defendants had more involvement than in those cases. That is not so. At the time McKenna placed Plaintiffs' image on the cover, he controlled what appeared on the cover of his book. *See* McKenna Decl. ¶¶ 1, 5 ("The Self-Publishing Platforms did not have any role in creating, designing or editing the cover or content of *Gronking*."). Contrary to Plaintiffs' assertion, the Eleventh Circuit in *Almeida* did not rely exclusively on Amazon's role as bookseller in-and-of-itself. Rather, the court granted summary judgment in Amazon's favor on the basis that, as in this case, "Amazon does not make editorial choices as to the book cover images it displays on its website." *Almeida*, 456 F.3d at 1326. It further explained that, just as in this case, Almeida did not allege that "Amazon's display of her image emphasized her role . . . or . . . can be distinguished from Amazon's customary display of book cover images." *Id*. Similarly, the court in *Sandler* relied on the defendant's lack of "editorial control" or other "communal process with the author." 565 F. Supp. 2d at 195.

***Second***, these cases are not distinguishable based upon "access" to the author. Even assuming Defendants had such "access," that does not constitute editorial control. If "use" under the R.C. Chapter 2741 extended to any involvement whatsoever with a Plaintiff's photographic likeness, the statute would sweep far too broadly: it would proscribe graphics software used to create allegedly infringing book covers, credit card payment processing services used to transact infringing goods, and internet broadband services used to transmit infringing content. Thus, some editorial choice must be present before a defendant's actions can rise to a level that exceeds "incidental use" and may qualify as "use" under the statute. Nor does the fact that Defendants ultimately made efforts to contact McKenna (as it turns out, after he had already replaced the image), provide any basis for liability. A contrary rule would simultaneously create strict

17

liability (which Ohio rejects) and discourage efforts to mitigate damages in the face of actual knowledge.

*Finally*, contrary to Plaintiffs' suggestion, the Eleventh Circuit in *Almeida* did not base its decision on the plaintiff's consent to the inclusion of her photograph in the book. 456 F.3d at 1325 ("[W]e do not reach the issue of whether [the statute's provision for consent] applies to the facts of this case"). Rather, just as in *Almeida* and *Sandler*, the mere fact that McKenna used Plaintiffs' photo on the cover of his Book does not constitute anything more than incidental use of Plaintiffs' likeness by Defendants.

> **2.     The Record Contains No Evidence to Support a Claim for Invasion of Privacy by False Light Publicity.**

Although unclear from the allegations of their complaint, Plaintiffs in their opposition brief also argue a claim for false light publicity. To establish such a claim under Ohio's common law, Plaintiffs must show publicity of a matter about them that places them "before the public in a false light" where "(a) the false light . . . would be highly offensive to a reasonable person, and (b) the [defendant] had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 467 (2007) (adopting Restatement (Second) Torts § 652E). To support a claim based on alleged reckless conduct, Plaintiffs must submit "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Ashby v. Hustler Magazine, Inc*., 802 F.2d 856, 860 (6th Cir. 1986). Moreover, evidence that the defendant had knowledge of, or acted in reckless disregard as to the falsity of the publicized matter must be proven by clear and convincing evidence. *Patrick v. Cleveland Scene Publ'g*, 582 F. Supp. 2d 939, 954 (N.D. Ohio 2008). The record contains no evidence at all, much less clear and convincing evidence, that any false information was publicized or that Defendants had

knowledge of, or entertained any doubts with regard to the falsity of any matter publicized about the Plaintiffs.

Plaintiffs appear to argue that falsehoods were publicized placing them in a false light because their appearance on the cover of the Book may have caused readers to visualize them undertaking the actions of the characters therein. *See* Opp. at 16. However, nothing about the appearance of an individual on the cover of an obviously fictional book could possibly imply that this individual is actually the person in the book. *See* McKenna Decl. ¶ 2 (stating that the Book "is a work of pure fiction").

Similarly, "[w]here a statement obviously purports to be fictitious, there can be no falsity of the publicized matter, and, therefore, no reckless disregard for such falsity." *Botts v. N.Y. Times Co*., 2003 U.S. Dist. LEXIS 23785, at *19-20 (D.N.J. Aug. 29, 2003) (internal quotation marks omitted); *see also Patrick*, 582 F. Supp. 2d at 954 ("The 'publicized' statement must be untrue."). The court in *Botts* explained that an advertisement containing the plaintiff's name that obviously purported to be fictitious could not support a false light claim because the advertisement did not "purport to depict a real individual, but rather a type of person (i.e., an uneducated young African-American male)." 2003 U.S. Dist. LEXIS 23785, at *20. Analogously, there was nothing false contained in the photograph of the Plaintiffs, nor could they be truthfully or falsely associated with the contents of a book that contained no facts.

The Plaintiffs' R.C. Chapter 2741 claim also fails because McKenna's book falls within the exception for "literary" and "fictional" works. Plaintiffs argue that because the photograph at issue is not fiction, the exception does not apply. *See* Opp. at 12-13. The "work" relevant to the exception is the Book, not the Plaintiffs' photograph. Plaintiffs' reading of the statute would render the exception meaningless because the right of publicity can only be claimed based on a

use of some non-fictional individual's persona. Under the Plaintiffs' misguided reading, any real individual could always assert that he or she, or an image of that individual, was not fictitious and therefore the exception would never apply.

Even if the Plaintiffs could show that some information about them was falsely represented by their appearance on the Book's cover, they submit no facts to support the high burden of proof required to show that Defendants acted with recklessness towards the falsity of any representation made about them. The record contains no evidence that Defendants had any reason to doubt the representations made by McKenna. Instead of meeting their burden, Plaintiffs merely assert that Defendants did not require and review documentary evidence of intellectual rights for every picture uploaded through the self-publishing platforms. *See* Opp. at 17. The law does not require them to do so. Rather, they can be found reckless only if Defendants had "serious doubts" as to the truth of the image and then assisted in the distribution of the Book with the image on its cover. *See Ashby*, 802 F.2d at 860. The undisputed facts establish that Defendants had no reason at all to doubt the truth or falsity of the image at the time of its publication and acted swiftly to remove it when each received a complaint concerning it. *See* McKenna Decl. ¶ 18 ("As a result of the largely automated process of self-publishing a book, as well as the representations in the Terms of Service that I agreed to, to the best of my knowledge, [Defendants] did not know or have any reason to know that the images I used . . . were of the [P]laintiffs . . . or that those images were used without express permission.").

## CONCLUSION

For the reasons stated herein and in their respective motions (as well as those of co-defendant Amazon.com, which are hereby incorporated by reference), summary judgment should be granted in favor of Barnes & Noble, Inc. and Smashwords, Inc.

Respectfully submitted,

/s/ Aneca E. Lasley
Aneca E. Lasley (0072366)
Trial Attorney
Squire Patton Boggs (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
614.365.2700
614.365.2499 (facsimile)
aneca.lasley@squirepb.com

Attorney for Barnes & Noble Inc.
and Smashwords, Inc.

Peter K. Stris
(admitted *pro hac vice*)
Elizabeth Rogers Brannen
(admitted *pro hac vice*)
Victor O'Connell
(admitted *pro hac vice*)
Stris & Maher LLP
725 S. Figueroa St., Ste. 1830
Los Angeles, CA 90017
213.995.6800
213.261.0299 (fax)
peter.stris@strismaher.com
elizabeth.brannen@strismaher.com
victor.oconnell@strismaher.com

Attorneys for Smashwords, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of November, 2015, the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, and notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

/s/ Aneca E. Lasley

Attorney for Barnes & Noble Inc.
and Smashwords, Inc.